IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

STEVEN ANDERSON,                    )
                                    )
            Plaintiff,              )
                                    )
vs.                                 )        Case No. 3:19-cv-488-MAB
                                    )
WEXFORD HEALTH SOURCES, ET          )
AL.,                                )
                                    )
            Defendants.             )
                                    )
                                    )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment filed by Defendants Venerio Santos, M.D. and Wexford Health Sources, Inc. (Doc. 151), and Defendants Glenn Slane, Joe Loera, Jon Fatheree, Lana Nalewajka, Michelle Dulle, Ira Jack, Anissa Shaw, Trevor Chitwood, and Aaron Toennies (Doc. 158). Santos and Wexford also filed a supplemental motion requesting that Plaintiff's response to their motion for summary judgment and several corresponding exhibits remain sealed (Doc. 169). For the reasons explained below, the motions for summary judgment are GRANTED, and the supplemental motion to seal documents is DENIED.

## I.    BACKGROUND

Plaintiff filed this civil rights action pursuant to 42 U.S.C. § 1983 on May 9, 2019 for deprivations of his constitutional rights at Centralia Correctional Center ("Centralia") (Docs. 1, 11). Plaintiff claims that prison officials, medical staff, and Wexford Health

Sources, Inc. ("Wexford") exhibited deliberate indifference to his broken hand by delaying surgery for a compound fracture and regularly handcuffing him behind his back, and also used excessive force in handcuffing him behind the back (Doc. 11 at p. 1). After a threshold review, pursuant to 28 U.S.C. § 1915A, Plaintiff was allowed to proceed on two separate counts against Defendants:

> **Count 1**: Eighth Amendment excessive force claim against Defendants Slane, Loera, Jack, Toennies, and John Doe2 for repeatedly rear-cuffing Plaintiff while he suffered from a broken hand from August 22, 2018 until October 18, 2018.

> **Count 2**: Eighth Amendment deliberate indifference claim against Defendants Wexford, Santos, Dan Zec,[1] Nalewajka, Shaw, Dulle, Slane, Loera, Jack, Toennies, and Sergeant John Doe3 for unnecessarily delaying Plaintiff's medical treatment for a broken hand or causing additional pain/injury while he awaited treatment for the injury from August 22, 2018 until October 18, 2018

(Doc. 11).[2]

Santos and Wexford filed a motion for summary judgment, with a memorandum in support and exhibits, on June 15, 2022 (Docs. 151, 152). Defendants Slane, Loera, Fatheree, Nalewajka, Dulle, Jack, Shaw, Chitwood, and Toennies filed a combined motion for summary judgment and memorandum in support, with exhibits, on August 5, 2022 (Doc. 158).

On October 19, 2022, Plaintiff filed a motion to file his responses to the summary

---

[1] The claim against Defendant Zec was dismissed without prejudice on July 20, 2020 for failure to exhaust administrative remedies (Doc. 115).
[2] Defendant Jon Fatheree, the Warden at Centralia, was added as a Defendant in his official capacity only for purposes of discovering the identify of Sergeant John Doe3 (Doc. 11). Sergeant John Doe3 was identified as Defendant Chitwood (Doc. 75). Thus, Fatheree is dismissed from the case with prejudice.

judgment motions under seal. In the motion, he stated that documents and deposition testimony he sought to include with his responses had been marked by Wexford as, "Confidential pursuant to the Protective Order" (Doc. 165). The Court provisionally granted the motion in order to preserve the briefing schedule but ordered that Wexford file a supplemental motion explaining why these documents should remain sealed (Doc. 166). On October 20, 2022, Plaintiff filed his responses to the summary judgment motions and exhibits under seal (Docs. 167, 168). On November 3, 2022, Wexford and Santos filed a supplemental motion for the documents to remain sealed (Doc. 169). On November 3, Defendants also filed replies to Plaintiff's responses (Docs. 170, 171). The Court will first address the supplemental motion to seal and then address the motions for summary judgment.

## II.    SUPPLEMENTAL MOTION TO SEAL

Wexford and Santos argue that Plaintiff's response to their summary judgment motion and three exhibits to the response should remained sealed (Doc. 169). They argue that they have sought to prevent disclosure of certain exhibits through the protective order entered in this case; the documents at issue include trade secrets; and disclosure of the information in the documents would cause competitive harm (*Id.*).

"Secrecy in judicial proceedings is disfavored." *GEA Grp. AG v. Flex-N-Gate Corp.*, 740 F.3d 411, 419 (7th Cir. 2014). "Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality." *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010); s*ee also Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir.

2002) ("In civil litigation only trade secrets, information covered by a recognized privilege (such as the attorney-client privilege), and information required by statute to be maintained in confidence (such as the name of a minor victim of a sexual assault), is entitled to be kept secret . . . ."). The Seventh Circuit has emphasized "that litigation be conducted in public to the maximum extent consistent with respecting trade secrets. . . and other facts that should be held in confidence." *Hicklin Eng'g, L.c. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006), *abrogated on other grounds by Americold Realty Trust v. Conagra Foods, Inc.*, 57 U.S. 378 (2016). Motions to seal parts of the record should be granted "only if there is good cause" for doing so. *Citizens First Nat. Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999).

The following are the documents Wexford and Santos want to keep sealed from the public domain:

1. Doc. 168: Plaintiff's Response to Wexford and Santos's Motion for Summary Judgment
2. Doc. 168-4 (Exhibit D): Fed. R. Civ. P. 30(b)(6) witness Dr. Glen Babich's deposition transcript. Santos and Wexford contend that a partially redacted version of the deposition could be filed and not placed under seal. They have emailed a proposed redacted version to the Court.
3. Doc. 168-5 (Exhibit E): Wexford Health Sources Inc.'s internal Medical Guidelines for the Illinois Region;
4. Doc. 168-6 (Exhibit F): Wexford Health Sources, Inc.'s internal Utilization Management Guidelines for the Illinois Region;

(Doc. 169, p. 2). The Court notes that Plaintiff's response to the IDOC Defendants' motion for summary judgment is also sealed (*see* Doc. 167), but Wexford and Santos make no argument regarding that response or the associated exhibits and whether it should remain sealed.

Santos and Wexford contend that the Utilization Management Guidelines and Medical Guidelines depict trade secrets, and Plaintiff's response and Babich's deposition include excerpts or discussions of these documents (Doc. 169, p. 4). The Illinois Trade Secrets Act (the "Act"), states that a trade secret is:

> information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, [or] technique…that is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.

765 ILL. COMP. STAT. § 1065/2(d).

In analyzing whether an alleged trade secret meets these requirement, Illinois courts look to the following factors: "(1) the extent to which the information is known outside of the [movant's] business; (2) the extent to which the information is known by employees and others involved in the [movant's] business; (3) the extent of measures taken by the [movant] to guard the secrecy of the information; (4) the value of the information to the [movant's] business and to its competitors; (5) the amount of time, effort and money expended by the [movant] in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 722 (7th Cir. 2003).

Ultimately, Santos and Wexford's briefing does not sufficiently address the many factors the Court must weigh to determine whether the exhibits at issue constitute trade secrets. Although Santos and Wexford argue that Wexford took reasonable steps to

prevent disclosure of these exhibits by seeking a protective order in this case (Doc. 169, p. 3-5), the protective order functions to maintain the secrecy of sensitive materials produced during *discovery* and is not indicative of whether materials filed with the Court can be shielded from public view (*see* Doc. 137). The Protective Order states that the Court will make "an individualized determination of whether any such protected document(s) or information can be filed under seal" (*Id.* at ¶ 11). *See also Baxter Intern., Inc.*, 297 F.3d at 545 ("Secrecy is fine at the discovery stage, before the material enters the judicial record."); *Bond v. Utreras*, 585 F.3d 1061, 1073 (7th Cir. 2009) ("While the public has a presumptive right to access discovery materials that are filed with the court…the same is not true of materials produced during discovery but not filed with the court.").

Nor have Defendants stated how, in practice, Wexford maintains the secrecy of its internal guidelines and procedures; the extent to which this type of information is known outside of Wexford's business or to others involved in its business; the amount of resources Wexford has expended to develop the system and its internal guidelines; or the ease or difficulty with which the information could be properly acquired or duplicated. Certainly this is not the first time an internal Wexford policy or procedure regarding treatment has made its way into a court record. *See e.g., Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019) ("Wexford's own Medical Policy and Procedures on the Repair of Abdominal Wall/Inguinal Hernias (introduced into evidence by Wilson)"). Moreover, Santos and Wexford submitted excerpts from Dr. Babich's deposition transcript unsealed (*see* Doc. 152-4), but have redacted many of those same excerpts in

the proposed exhibit they have sent to the Court. This leads to Court to believe that they have redacted portions of the deposition transcript unnecessarily.

Santos and Wexford argue that competitors could use the information depicted in the exhibits to "gain an advantage in competing with other private healthcare companies" and that "disclosure of the policies would cause competitive harm" (Doc. 169, p. 4). However, they do not explain with sufficient particularity what is depicted in the exhibits that subjects it to a potential harm. A party seeking to avoid disclosure must sufficiently explain how disclosure would cause harm and why the predicted harm warrants secrecy. *See Baxter*, 297 F.3d at 547 ("Beyond asserting that the document must be kept confidential because we say so…this contends only that disclosure 'could…harm Abbott's competitive positions.' How? Not explained. Why is this sort of harm (whatever it may be) a legal justification for secrecy in litigation? Not explained."). Santos and Wexford have not established that good cause exists to seal the exhibits, such that Wexford's privacy interests outweigh the interests of the public in full transparency of the judiciary. Accordingly, Santos and Wexford's Supplemental Motion to Seal Documents (Doc. 169) is **DENIED**. The Clerk of Court will be **DIRECTED to UNSEAL** Docs. 167 and 168 and the associated exhibits.

### III.   MOTION FOR SUMMARY JUDGMENT

### A.   Undisputed Facts

Plaintiff has been incarcerated with the Illinois Department of Corrections ("IDOC") since 2013 (Doc. 152-1 at p. 10). From some time in 2017 to January 9, 2019, he was incarcerated at Centralia Correctional Center ("Centralia") (Doc. 152-1 at p. 11).

### i.      Delay in Surgery

On the evening of August 22, Plaintiff was in an altercation with other inmates in which he injured his left hand (Doc. 152-3 at p. 114-15). Approximately 15 minutes afterward, he was seen by a nurse (*Id.*). The nurse observed swelling to his left hand and slight swelling to his right temple (*Id.*). She referred him to Dr. Santos, Centralia's Medical Director (Doc. 152-2 at p. 16-17), and provided him a cold pack and Ibuprofen (Doc. 152-3 at p. 114-15). That evening, Plaintiff saw Santos for an evaluation of his injury (Doc. 152-1 at p. 63; 152-3 at p. 116). After examining the hand, Santos ordered x-rays and a follow-up appointment (*Id.*). According to Plaintiff, Santos told him they needed to wait until the swelling went down to complete the x-ray (Doc. 152-1 at p. 63). Santos stated in his deposition that an x-ray tech was only available on certain days to complete the x-ray (Doc. 152-2 at p. 30). On August 25, 2018, Plaintiff's left hand was x-rayed, and the x-ray showed a fracture (Doc. 152-3 at p. 76).

Defendant Nurse Anissa Shaw regularly did rounds in the segregation wing where Plaintiff was housed to pass out medication prescribed by prison doctors (Doc. 158-10 at p. 9-10). She saw Plaintiff on August 25 (Doc. 152-3 at p. 117) and noted that x-rays of Plaintiff's left hand had been completed (*Id*). Shaw gave Plaintiff pain medication prescribed by Santos, and at Santos's direction, scheduled Plaintiff for Santos's next available appointment to review the x-rays (*Id.*). On August 27, 2018, Plaintiff saw Santos, who submitted an urgent referral for Plaintiff to have an orthopedic consultation for the fracture (*Id.*). On August 31, 2018, Plaintiff saw Dr. Alan L. Froehling, an orthopedic surgeon, who recommended surgery (Doc. 152-3 at p. 61-62). Dr. Froehling also provided

Plaintiff with a "half splint" (Doc. 152-1 at p. 66-67). On September 1, 2018, Plaintiff saw Santos again, and Santos approved Dr. Froehling's recommendation for surgery and provided Plaintiff with Motrin for his pain (Doc. 152-2 at p. 38-39, 152-3 at p. 99). Santos's recommendations for surgery were handled by the Utilization Management team at Wexford (Doc. 152-2 at p. 43, 45). Santos did not handle the scheduling of surgeries or next steps if a surgery was cancelled and testified that he cannot reschedule a surgery if it is cancelled (*Id.*).

Plaintiff's surgery was scheduled for September 11, 2018 (Doc. 152-3 at p. 30-31). On September 10, Defendant IDOC Health Care Unit Administrator (HCUA) Lana Nalewajka received notice that Dr. Froehling's office was canceling the procedure because they did not have a public aid number for the Plaintiff (Doc. 152-3 at p. 30-31).[3] Wexford paid for outpatient surgery, such as Plaintiff's (Doc. 158-2 at p. 9). For in-patient procedures, an inmate was issued a public aid number, and Medicaid covered the cost of an in-patient stay (*Id.*). Nalewajka testified that because all billing went through Wexford, she provided Dr. Froehling's office with Wexford's billing phone number (Doc. 158-2 at p. 9).[4] Wexford's Corporate Representative, Dr. Babich, testified that the trouble in

---

[3] Plaintiff argues that there is a question of material fact as to whether Nalewajka learned about the billing issues with Plaintiff's first surgery before September 10 because Dr. Froehling stated in his notes that his office spent multiple hours and days trying to get certification for Plaintiff's procedure (Doc. 167). However, there is no evidence in the record to suggest that Dr. Froehling's office contacted Nalewajka or the HCU prior to September 10 (Doc. 152-3 at p. 10).

[4] Though it is undisputed that Dr. Froehling should not have needed the public aid number for billing because Plaintiff's surgery was an outpatient procedure, there is discrepancy among the Defendants as to whether IDOC or Wexford was responsible for requesting and/or providing the public aid number at that time (Doc. 152-4 at p. 226, 240-241). However, the record shows that Nalewajka was not able to get the number without additional assistance from Wexford (Doc. 152-3 at p. 31).

securing Plaintiff's public aid number around the time of his surgery was a result of the Medicaid office refusing to issue numbers to inmates (Doc. 152-4 at p. 226, 240-241).

On September 11, 2018, Nalewajka contacted her supervisor, IDOC Office of Health Service Regional Coordinator Mary Klein, regarding Plaintiff's situation, and Klein stated she would look into a resolution (Doc. 152-3 at p. 31). Nalewajka and Klein had a follow-up conversation on September 13, 2018, and Klein told Nalewajka she spoke with someone at Illinois Health and Family Services ("HFS") who was going to assist with getting the needed number (Docs. 152-3 at p. 31; 158-2 at p. 9-10). On September 17, 2018, Nalewajka telephoned Dan Zec with Wexford. He indicated he would submit Plaintiff for Medicaid enrollment so that they could get the public aid number (*Id.*). The next day, Nalewajka followed up with Zec, but he was still waiting for the necessary information to complete enrollment (*Id.*). Nalewajka continued to follow up with Zec daily (*Id.*).

On September 20, 2018, Nalewajka received Plaintiff's public aid number (*Id.*). On September 20 or 21, Nalewajka contacted Dr. Froehling's office only to learn that the public aid number provided was Plaintiff's number for aid outside of IDOC; therefore, Plaintiff could still not be scheduled for surgery (Docs. 152-3 at p. 31; 158-2 at p. 9). Nalewajka notified Zec of this development on September 21 (*Id.*). She attempted to contact L. Williams[5] from HFS twice regarding the issue and left a message for Klein. On September 24, Williams called Nalewajka back and indicated that she would forward the

---

[5] It appears from the record that "L. Williams" is Latitia Williams (Doc. 158-2 at p. 13).

issue to personnel within HFS who should handle it (Docs. 152-3 at p. 31; 158-2 at p. 20). Nalewajka also spoke with Jessica Knebel from Wexford, who scheduled surgeries for inmates, to discuss whether the surgery could be performed by another doctor (Docs. 152-3 at p. 31, 158-2 at p. 21). The outcome of this conversation is unclear. Throughout this time, Nalewajka also communicated with several other individuals from Wexford and IDOC to either update them on the delay in treatment or try to get the needed number (Docs. 152-3 at p. 31; 158-2 at p. 12-13).

On September 13, 2018, Nurse Shaw visited Plaintiff in his cell to drop of his medications. During her visit, Plaintiff rated his pain as an "8" (Docs. 152-3 at p. 33, 158-10 at p. 8-9). Shaw knew that Plaintiff had seen Santos for his injuries and was going to have surgery at some point, but she was not aware his surgery had been cancelled (Doc. 158-10 at p. 8-9). She was not responsible for recommending, approving, or scheduling surgery (*Id.*). Shaw took Plaintiff's blood pressure and pulse (Doc. 152-3 at p. 33). She checked for a distal pulse in his left hand, capillary refill, and circulatory integrity, all of which were present (*Id.*). She also noted that there was no discoloration. Plaintiff's hand was still in the half-splint provided by Dr Froehling, so Shaw could not visualize whether the hand was swollen (*Id.*). She noted that Plaintiff's range of motion with his left hand was lessened by the fracture and associated pain (*Id.*). She provided Plaintiff with pain medication prescribed by Santos (Docs. 152-3 p. 33; 158-10 at p. 8-9). If Plaintiff wished for additional medical evaluation by a doctor, standard protocol was for him to fill out a

sick call request (Doc. 158-10 at p. 10).[6]

Around September 25, 2018, Dr. Froehling's office was provided with the correct public aid number for billing (Doc. 152-2 at 48). On September 25, Santos submitted an urgent referral for Plaintiff to see Dr. Froehling (Doc. 152-3 at p. 125). On September 27, 2018, Plaintiff saw Dr. Froehling, who noted that Plaintiff had a healing malunion at the fracture site due to a delay in treatment. Dr. Froehling did not feel comfortable moving forward with surgery and recommended that Plaintiff be referred to a hand specialist (Doc. 152-3 at p. 63-64, 68). The same day, Santos submitted an urgent referral for an evaluation by a hand specialist (Doc. 152-3 at p. 65-66). The next day, Plaintiff was scheduled for an October 11 appointment with Dr. Diederich, a hand specialist (Doc. 152-3 at p. 40). Dr. Diederich documented that:

> I was very upfront about the risks involved as well as expectations [of surgery]. Further this has been a very prolonged delay in presentation. I was upfront that there is a high risk of nonunion or malunion . . . He understands he may never regain function of this hand. He may never be able to heal this fracture.

(Doc. 152-3 at p. 69-71).

After discussing the benefits and risks of surgery with Dr. Diederich, Plaintiff elected to proceed (Doc. 152-3 at p. 69-71).

Dr. Diederich performed the surgery on October 18 (Doc. 152-3 at p. 72-73). Dr. Diederich documented that surgery went well and placed Plaintiff's left hand in a splint and Ace bandage wrap (*Id.*). Plaintiff returned to the prison that afternoon and was

---

[6] Plaintiff testified that on at least one unspecified occasion, he requested that Shaw speak to her "supervisor" about his pain and suffering, and nothing happened (Doc. 167-2 at p. 10).

admitted to the infirmary for monitoring by medical staff (Docs. 152-3 at p. 50, 52; 158-1 at p. 22).

On November 8, 2018, Plaintiff was discharged from the Centralia infirmary and instructed to continue wearing his splint (Doc. 152-3 at p. 16-17). On December 6, 2018, Plaintiff saw Dr. Diederich for a follow-up appointment. He noted that Plaintiff's hand was healed and he had good range of motion (Doc. 152-3 at p. 86). On December 8, 2018, Plaintiff was seen by another physician at Centralia who noted that Plaintiff was released from the orthopedist and that the fracture had healed (Doc. 152-3 at p. 22).

On December 12, 2018, Plaintiff saw Social Worker Michelle Dulle and reported that his hand was feeling fine and he was working on hand exercises (Doc. 152-3 at p. 107). Dulle did not recall Plaintiff complaining to her of problems scheduling his surgery or of pain in his hand. Dulle can enter a sick slip for an inmate to be seen by a doctor if she believes it is necessary. However, she did not enter one for the Plaintiff (Doc. 167-8 at p. 9).

On January 8, 2019, Plaintiff saw Santos, who documented that Plaintiff had no complaints. He told Plaintiff to continue his range of motion exercises (Doc. 152-3 at p. 23). Plaintiff was transferred to Western Illinois Correctional Center on January 9, 2019 (Doc. 152-3 at p. 24-25). On February 8, 2019, Plaintiff saw an occupational therapist, who noted that Plaintiff's left-hand activity was limited by pain, decreased range of motion, and lack of strength (Doc. 152-3 at p. 90). Plaintiff continues to experience pain, stiffness, and numbness in his hand (Doc. 152-1 at p. 21).

According to Wexford's Medical Guidelines, if a doctor makes an urgent referral,

then the inmate must be scheduled, seen, and receive treatment within 30 days. (Docs. 168-4 at p. 76-77; 168-5). The Medical Guidelines specify that the site Medical Director (Santos in this case) and the Utilization Management Director are to create a Launch Report, which includes a targeted date for completion of services (Doc. 168-6 at p. 10). If the scheduler for that prison (non-party Knebel in this case) is unable to obtain an appointment date by the targeted completion date, she is to notify the site Medical Director and the Utilization Management Department (*Id.*). The Launch Report is to be kept on file for future reference (*Id.*). Reviewing the record, nothing indicates Santos and the Utilization Management Director created a Launch Report for Plaintiff's injury (Doc. 168-4 at p. 120-122, 131).

### ii.    Rear-Cuffing

When an individual is in segregation, as Plaintiff was throughout the relevant time period, he is handcuffed every time he leaves the cell (Doc. 167-1 at p. 26). Standard protocol is to handcuff individuals behind the back due to the security concern that if front-cuffed, an individual could use his hands to choke or attack someone (Docs. 167-4 at p. 48; 167-5 at p. 19-20; 167-6 at p. 22). Plaintiff testified rear-cuffing put more pressure on his broken hand (Doc 152-1 at p. 24). A doctor must order a front-cuff permit (Doc. 152-1 at p. 26). Prison officers are expected to follow directives and policies regarding handcuffing but have some discretion in how to handcuff inmates. For instance, they can front-cuff an inmate when an inmate has a cast that the handcuffs will otherwise not fit over (Docs. 167-4 at p. 10; 167-5 at p. 7, 10).

Defendants Slane, Loera, Jack, Chitwood, and Toennies are officers at Centralia

(Doc. 47). On October 5, 2018, Defendant Slane told Plaintiff he could request a front-cuff medical permit, and Plaintiff submitted the request the same day (Doc. 167-2 at p. 28-29). On October 9, 2018, Nalewajka responded, stating, "I spoke with Santos regarding your request and he states that there is no medical reason to write a front handcuffing permit at this time" (Doc. 152-3 at p. 51). Santos did not believe a front cuff permit was medically necessary because Plaintiff did not have an injury to his wrist or shoulders (Doc. 167-2 at p. 17).

Toennies and Jack recalled that Plaintiff would remind officers that his hand was sore, so the officers were gentle and placed the cuffs up on his wrists (Docs. 167-5 at p. 11; 167-6 at p. 6). Slane contacted the healthcare unit to see if Plaintiff had been provided a front-cuff permit and believed nurses were sent to see Plaintiff. Slane also began using two sets of handcuffs to cuff Plaintiff behind his back to lessen the pressure on Plaintiff's wrists (Doc. 167-4 at p. 7, 13).

## B. <u>Legal Standards</u>

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may

not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014) (citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

## C.   <u>Discussion</u>

### i.   **Deliberate Indifference**

With regard to Plaintiff's deliberate indifference claims, the Eighth Amendment's proscription against cruel and unusual punishment safeguards prisoners against "pain and suffering [that] no one suggests would serve any penological purpose." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)) (internal quotation marks omitted). Supreme Court has thus recognized that the Eighth Amendment creates an obligation for prison officials to provide inmates with adequate medical care. *Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). Evaluating whether the Eighth Amendment has been violated in the prison medical context involves a two-prong analysis. The court first looks at whether the plaintiff suffered from an objectively serious medical condition and, second, whether the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *E.g., Roe*, 631 F.3d at 857. In applying this test, the court "look[s] at the totality of an inmate's medical care when considering whether that care

evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728–29 (7th Cir. 2016).

A hand fracture is a serious medical need, *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015), and moreover, Defendants do not argue that Plaintiff did not have serious medical need. Therefore, with regard to Plaintiff's deliberate indifference claim, the question for the Court is whether Defendants acted with deliberate indifference to that condition. A prison official exhibits deliberate indifference when he or she knows of a serious risk to the prisoner's health exists but consciously disregards that risk. *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (citation omitted). The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Id*.

   a. Santos and Nalewajka

Plaintiff argues Santos and Nalewajka were deliberately indifferent to the delay in Plaintiff receiving surgery. "A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). However, the record shows that neither Santos nor Nalewajka were responsible for the delay or otherwise indifferent to Santos's suffering.

Dr. Santos examined Plaintiff the evening of his injury and immediately ordered x-rays to rule out a fracture. Plaintiff saw Santos two days after the x-ray was taken, which was the first appointment he had available, and Santos submitted an urgent referral for Plaintiff to see an orthopedic surgeon. The day after Plaintiff saw Dr. Froehling, Santos

followed the surgeon's recommendation and referred Plaintiff for surgery and provided him with medication for the pain. When Dr. Froehling recommended that Plaintiff see a hand specialist, Santos again submitted an urgent referral in line with Dr. Froehling's recommendation. He then immediately followed the recommendations of the hand specialist and referred Plaintiff for hand surgery. Given Santos's continuous and timely care of Plaintiff, no jury could find he had the required mindset to show deliberate indifference. *See Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (deliberate indifference requires a showing of something approaching a total unconcern for the prisoner's welfare in the face of serious risks); *see also Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (defendant's response must be so plainly inappropriate as to permit the inference that the defendant intentionally or recklessly disregarded inmate's needs); *cf. Page v. Obaisi*, 318 F. Supp. 3d 1094, 1103 (N.D. Ill. 2018) (doctor and physician's assistant not deliberately indifferent to pain caused by plaintiff's fracture where they prescribed Motrin, refilled the prescription, and monitored plaintiff's condition with x-rays and follow up appointments).

Moreover, Santos's actions did not create the delay in Plaintiff receiving surgery, and the record shows he could not reschedule a surgery if it was delayed by outside forces. Thus, Santos had no real hand in the delay and it cannot be used to show deliberate indifference on his part. *See Walker v. Benjamin*, 293 F.3d 1030, 1038 (7th Cir. 2002) (summary judgment was appropriate where plaintiff claimed deliberate indifference on the part of prison physician regarding the delay between his treatment at the prison and his referral to a specialist because plaintiff "presented no evidence that these delays were

even within [the prison physician's] control"). To the extent Santos did not create a Launch Report in violation of Wexford policy, there is no indication that creation of such a report would have prevented the delay in surgery, and a simple violation of a prison policy does not amount to a constitutional violation. *Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020).

Plaintiff also argues that Santos was deliberately indifferent in denying him a front-cuff permit. However, the record shows that Santos considered the permit and did not consider it medically necessary, given Plaintiff's type of injury. Although Plaintiff complained that rear-cuffing caused pain, the record does not indicate that the rear-cuffing caused an additional damage to his injury, he was rear-cuffed for extended periods of time, the pain was intolerable, or that front-cuffing was otherwise deemed medically necessary. *See Smith v. Butler*, No. 3:17-CV-00189-GCS, 2021 WL 5217723, at *9 (S.D. Ill. Sept. 7, 2021) (doctor not deliberately indifferent for denying front-cuff pass based on his opinion that injury did not warrant pass, even though orthopedist later recommended it; without additional evidence, denial was not such a substantial departure from accepted professional judgment as to warrant deliberate indifference claim); *Jordan v. Welborn*, No. 3:15-CV-822-NJR-DGW, 2017 WL 4159857, at *6 (S.D. Ill. Sept. 18, 2017) (doctors not deliberately indifferent absent evidence that denial of front-cuff pass was not based on reasonable medical judgment).

As for HCUA Nalewajka, nothing in the record shows she caused the delay in surgery or otherwise ignored the risk to Plaintiff as required to show deliberate indifference. *See McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (deliberate indifference

requires a showing of criminal recklessness standard, "that is, ignoring a known risk"). The record shows that upon receiving notice that Plaintiff's surgery was being cancelled due to the lack of a public aid number she made a number of calls trying to resolve the problem, including to her supervisor, Wexford employees, and HFS employees, to get the problem resolved. She also followed up nearly every day until the issue was resolved and contacted Knebel to discuss moving Plaintiff's surgery to another provider. To the extent she did not schedule Plaintiff's surgery with another provider, nothing in the record indicates she actually had the authority to do so, or that Plaintiff could have gotten the surgery more quickly from another provider. *See Walker v. Wexford Health Services, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019) (to be held liable for delaying treatment, there must be evidence that a "defendant's actions or inaction caused the delay in his treatment").

### b.  Shaw and Dulle

Plaintiff argues Nurse Shaw failed to provide him with a referral to a doctor even as Plaintiff continued to experience pain and a delay in treatment. However, the record does not indicate that Plaintiff asked Shaw to be referred to a doctor, and standard protocol was for Plaintiff to request a referral to a doctor by filling out a sick call slip. *See Scott v. Rector*, No. 13-CV-16-NJR-DGW, 2014 WL 5861333, at *6 (S.D. Ill. Nov. 12, 2014) (nurses not deliberately indifferent for requiring plaintiff to follow prison protocol in requesting an appointment to see a doctor where condition was not obviously an emergency). Moreover, the record does not indicate that Shaw's treatment was plainly inappropriate. On September 13, she took his blood pressure and pulse and checked for a distal pulse in his hand, capillary refill, and circulatory integrity, all of which were

present. She also noted that there was no discoloration in his hand, and provided Plaintiff with pain medication that Dr. Santos prescribed. Additionally, Plaintiff's hand was already in a half-splint at the time. *See id.* (granting summary judgment to nurse where there was no evidence that the course of treatment she provided was plainly inappropriate in light of plaintiff's complaints, or that plaintiff required an immediate referral to a doctor).

Similarly, Plaintiff argues that Dulle failed to refer him to a doctor, but again, Plaintiff did not ask her for such a referral. The record shows that when Dulle saw Plaintiff more than a month after his surgery in regard to his mental health, he told her that his hand felt fine. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (to show deliberate indifference "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference").[7]

### c.   Wexford

In his complaint, Plaintiff alleges that a Wexford policy or procedure caused the delay in surgery (*see* Doc. 1 at p. 6). In his response though, Plaintiff abandons that argument and instead argues that a policy or procedure led to Plaintiff being

---

[7] Plaintiff also argues that the other Defendants, including Shaw, Dulle, and Nalewajka, were deliberately indifferent in not telling him he could request a front-cuff pass. However, Plaintiff's complaint did not include such allegations against Dulle or Nalewajka (*see* Doc. 1), and he cannot add them now. *See Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) ("a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"). It is questionable whether he made such allegations against Shaw in his complaint, but even construing the complaint to contain such allegations, the record does not show that Plaintiff told Shaw about the pain he was experiencing from rear-cuffing. *See Whiting*, 839 F.3d at 662 (to show deliberate indifference "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference").

continuously rear-cuffed. However, he cannot add new allegations in a response to a motion for summary judgment. *See Grayson*, 308 F.3d at 817 ("a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"). Furthermore, it is undisputed that the delay in surgery was due to Dr. Froehling's office requiring a public aid number that should not have been needed for Plaintiff's outpatient surgery and HFS's refusal to provide inmates with public aid numbers. Plaintiff has pointed to neither an express Wexford policy nor a widespread practice that led to the delay. *See Calhoun v. Ramsey*, 408 F.3d 375, 379-81 (7th Cir. 2005) (to maintain *Monell* claim, plaintiff must show express policy or widespread practice led to constitutional violation).

### ii.     Excessive Force

With regard to Plaintiff's excessive force claims, the Eighth Amendment has been interpreted to prohibit the "unnecessary and wanton infliction of pain" on prisoners in a correctional institution. *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citing *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). In the context of a claim that a prison official used excessive force in violation of the Eighth Amendment, "'the core judicial inquiry' is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Outlaw*, 259 F.3d at 837 (quoting *Hudson*, 503 U.S. at 7). *Accord McCottrell v. White*, 933 F.3d 651, 663 (7th Cir. 2019) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). *See also Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005) ("[I]n order for a constitutional violation to exist, plaintiffs in a § 1983 action must establish that prison officials acted wantonly or . . . 'maliciously and sadistically for the

very purpose of causing harm.' Indeed, 'negligence or even gross negligence is not enough . . . .'") (citations omitted); *James v. Milwaukee Cnty.*, 956 F.2d 696, 699 (7th Cir. 1992) ("[P]rison conditions involving the wanton and unnecessary infliction of pain, totally without penological justification, offend the constitution." (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981))).

This standard takes into account that matters of internal security at a prison are entitled to deference in general,[8] and this deference extends to the use of force in response to an actual prison disturbance as well as to preventative measures. *Whitley*, 475 U.S. at 321–22; *McCottrell*, 933 F.3d at 663.

> [O]fficials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force. Despite the weight of these competing concerns, corrections officials must make their decisions "in haste, under pressure, and frequently without the luxury of a second chance." We accordingly concluded in *Whitley* that application of the deliberate indifference standard is inappropriate when authorities use force to put down a prison disturbance. Instead, "the question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."

*Hudson*, 503 U.S. at 6 (quoting *Whitley*, 475 U.S. at 320).

---

[8] *Rhodes v. Chapman*, 452 U.S. 337, 350 n.14 (1981) ("[A] prison's internal security is peculiarly a matter normally left to the discretion of prison administrators."); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) ("Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").

In determining the intent of the prison official who applied force, the court must examine a number of factors, including (1) the need for the application of force; (2) the amount of force that was used; (3) the extent of the injury the force caused to the inmate; (4) the extent of the threat reasonably perceived by the officer; and (5) any efforts made to temper the severity of the force used. *McCottrell*, 933 F.3d at 663 (citing *Whitley*, 475 U.S. at 321); *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 619 (7th Cir. 2022) (citation omitted). "From such considerations inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *McCottrell*, 933 F.3d at 663 (quoting *Whitley*, 475 U.S. at 321).

Plaintiff argues that Defendants Jack, Toennies, Slane, Chitwood and Loera used excessive force in continuing to rear-cuff him even though they knew of his hand injury.[9] However, the record shows Plaintiff was rear-cuffed due to a reasonable security concern. Nor did Plaintiff even have a front-cuff permit. Santos did not believe a front cuff permit was medically necessary because Plaintiff did not have an injury to his wrist or shoulders, therefore it is not as if Defendants were rear-cuffing Plaintiff in spite of a doctor's orders

---

[9] Plaintiff also argues that Jack, Toennies, Slane, Chitwood, and Loera were deliberately indifferent in continuing to rear-cuff Plaintiff. However, for security reasons, rear-cuffing was standard protocol absent a permit from a doctor or other extraordinary circumstances, and Santos determined that front-cuffing was not medically necessary. Plaintiff argues that Santos did not deny Plaintiff's application for a front-cuff permit until several weeks after the injury, during which time Jack, Toennies, Slane, Chitwood, and Loera continued to rear-cuff him and did not tell him how to request a front-cuff permit. However, Plaintiff was under Santos's care during that time, and Santos had not seen fit to issue a front-cuff permit. *See Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019), cert. denied, 140 S. Ct. 50 (2019) ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands").

to the contrary. Moreover, Defendants *did* take Plaintiff's injury into consideration and tried to be careful when cuffing him; and rear-cuffing did not cause additional injury beyond pain or soreness. No reasonable jury could conclude that Defendants acted "maliciously and sadistically for the very purpose of causing harm." *Harper*, 400 F.3d at 1065 (7th Cir. 2005); *see also Smith*, No. 3:17-CV-00189-GCS, 2021 WL 5217723, at *10 (defendant did not use excessive force and was not deliberately indifferent in rear-cuffing plaintiff where plaintiff did not have a front-cuff permit, no medical professional espoused that the rear-cuffing caused further injury, and the cuffing was done for security reasons).

## CONCLUSION

For the above stated reasons, the supplemental motion to seal (Doc. 169) is **DENIED**. The Clerk of Court is **DIRECTED to UNSEAL** Docs. 167 and 168, including all exhibits.

Defendants Venerio Santos, M.D. and Wexford Health Sources, Inc.'s Motion for Summary Judgment (Doc. 151) and Defendants Glenn Slane, Joe Loera, Jon Fatheree, Lana Nalewajka, Michelle Dulle, Ira Jack, Anissa Shaw, Trevor Chitwood, and Aaron Toennies's Motion for Summary Judgment (Doc. 158) are **GRANTED**. Judgment is granted in their favor, and this case is **DISMISSED with prejudice**.

The Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 30, 2023**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**